IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNOPSYS, INC., | No. C-04-3923 MMC |
| Plaintiff, | **ORDER GRANTING SYNOPSYS'S MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON DOCTRINE OF ASSIGNOR ESTOPPEL; VACATING HEARING** |
| v. | |
| MAGMA DESIGN AUTOMATION, INC., | |
| Defendant. | (Docket No. 80) |
| / | |

Before the Court is the motion filed April 11, 2005 by plaintiff Synopsys, Inc. ("Synopsys") for partial summary judgment, based on the doctrine of assignor estoppel. Defendant Magma Design Automation, Inc. ("Magma") has filed opposition to the motion, to which Synopsys has replied. Having considered the papers filed in support of and in opposition to the motion, the Court finds the matter appropriate for decision without oral argument, see Civil L.R. 7-1(b), and hereby VACATES the July 8, 2005 hearing. For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

In Synopsys's Second Amended Complaint, Synopsys asserts, inter alia, a cause of action against Magma for infringement of United States Patent No. 6,738,114 ("the '114 patent"), entitled "Method for the Physical Placement of an Integrated Circuit Adaptive to

Netlist Changes." (See Second Amended Complaint ("SAC) ¶¶ 92-102 and Ex. J.) The '114 patent identifies Lukas van Ginneken ("van Ginneken") and Narenda V. Shenoy ("Shenoy") as co-inventors, and identifies Synopsys as the assignee of the patent. (See id. Ex. J. at 1.)

Magma, in its fourth and fifth affirmative defenses, contends, based on various theories, that the '114 patent is invalid. (See Defendant Magma Design Automation, Inc.'s Amended Answer to Complaint and Counterclaims ("Answer") at 7:7-20.) In addition, Magma seeks, in its second counterclaim, a declaratory judgment of invalidity of the '114 patent. (See id. ¶¶ 119-123.)

Synopsys now moves for summary judgment on Magma's fourth and fifth affirmative defenses and second counterclaim, based on the doctrine of assignor estoppel. Synopsys contends that Magma was in privity with van Ginneken at all relevant times and, consequently, may not challenge the validity of the '114 patent.

**LEGAL STANDARDS**

**A. Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment as to "all or any part" of a claim "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(b), (c). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. See id. The Court may not weigh the evidence. See id. at 255. Rather, the nonmoving party's evidence must be believed and "all justifiable inferences must be drawn in [the nonmovant's] favor." See United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citing Liberty Lobby, 477 U.S. at 255).

The moving party bears the initial responsibility of informing the district court of the

basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325.

Where the moving party "bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial." See Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (citations omitted); see also Fontenot v. Upjohn, 780 F.2d 1190, 1194 (5th Cir. 1986) (holding when plaintiff moves for summary judgment on an issue upon which he bears the burden of proof, "he must establish beyond peradventure all of the essential elements of the claim . . . to warrant judgment in his favor.") (emphasis in original).

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." See Fed. R. Civ. P. 56(e); see also Liberty Lobby, 477 U.S. at 250. The opposing party need not show that the issue will be resolved conclusively in its favor. See Liberty Lobby, 477 U.S. at 248-49. All that is necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions of the truth at trial. See id.

**B.  Assignor Estoppel**

"Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity." Diamond Scientific Co. v. Amrico, Inc., 848 F.2d 1220, 1224 (Fed. Cir. 1988). "Without exceptional circumstances (such as an express reservation by the assignor of the right to challenge the validity of the patent or an express waiver by the assignee of the right to assert assignor estoppel), one who assigns a patent surrenders with that assignment the right to later challenge the validity of the assigned patent." Mentor Graphics Corp. v.

3

1  Quickturn Design Systems, Inc., 150 F.3d 1374, 1378 (Fed. Cir. 1998).  "[I]t is the implicit
2  representation by the assignor that the patent rights that he is assigning (presumably for
3  value) are not worthless that sets the assignor apart from the rest of the world and can
4  deprive him of the ability to challenge later the validity of the patent."  Diamond Scientific
5  Co., 848 F.2d at 1224.

6      "The estoppel also operates to bar other parties in privity with the assignor, such as
7  a corporation founded by the assignor."  Id.  Privity, for purposes of assignor estoppel, "is
8  determined upon a balance of the equities."  See Shamrock Technologies, Inc. v. Medical
9  Sterilization, Inc., 903 F.2d 789, 793 (Fed. Cir. 1990).  "Assessing a relationship for privity
10 involves evaluation of all direct and indirect contacts."  See Mentor Graphics, 150 F.3d at
11 1379.  "If an inventor assigns his invention to his employer company A and leaves to join
12 company B, whether company B is in privity and thus bound by the doctrine will depend on
13 the equities dictated by the relationship between the inventor and company B in light of the
14 act of infringement."  Shamrock Technologies, 903 F.2d at 793.  "The closer that
15 relationship, the more the equities will favor applying the doctrine to company B."  Id.
16 "What is significant is whether the ultimate infringer availed itself of the inventor's
17 knowledge and assistance to conduct infringement."  See Intel Corp. v. U.S. International
18 Trade Commission, 946 F.2d 821, 839 (Fed. Cir. 1991) (internal quotation and citation
19 omitted).

## DISCUSSION

### A. Standing

22     Magma argues that Synopsys lacks standing to assert assignor estoppel against
23 Magma because Synopsys is not the sole owner of the '114 patent.  According to Magma,
24 the '114 patent is jointly owned by Synopsys and IBM, and, as Magma correctly points out,
25 all co-owners of a patent "normally must join as plaintiffs in an infringement suit."  See
26 International Nutrition Co. v. Horphag Research Ltd., 257 F.3d 1324, 1331 (Fed. Cir. 2001).
27 Whether Synopsys may sue Magma for infringement is not an issue currently before the
28

Court, however.[1]  Rather, Magma is suing Synopsys (and not IBM) for a declaratory judgment of invalidity of the '114 patent, a claim that exists independent of any infringement claim brought by Synopsys.

Moreover, Synopsys's assertion of assignor estoppel operates as a defense to Magma's claim of invalidity.  See Metro Traffic Control, Inc. v. Shadow Network, Inc., 104 F.3d 336, 340 (Fed. Cir. 1997) (referring to assignor estoppel as an "equitable defense"); see also Intel, 946 F.2d at 837 (describing assignor estoppel as defense).  Magma has cited no case holding that a defendant cannot defend against a claim of invalidity without first seeking to join the co-owner of the patent as a co-defendant, nor is the Court aware of any authority requiring all defendants to agree before one of them may assert a defense.  As Magma has raised the issue of invalidity of the '114 patent, Synopsys may defend against it.

Accordingly, the Court rejects Magma's argument that Synopsys lacks standing to assert the doctrine of assignor estoppel against Magma.

**B.  Assignor Estoppel**

**1.  The '114 Patent and van Ginneken**

On July 1, 1997, Synopsys filed a United States patent application, entitled "A Method for the Physical Placement of an Integrated Circuit Adaptive to Netlist Changes" ("'114 patent application"), which identified van Ginneken and Shinoy as co-inventors.  (See Edelman Decl. Ex. A.)  On the same date, van Ginneken and Shinoy each executed a declaration and power of attorney, in which each attests he is the "original, first and joint inventor" of the invention described in the '114 patent application.  (See id. Ex. B.)  In addition, on the same date, van Ginneken and Shinoy executed an assignment to Synopsys of "the entire right, title, and interest for the United States and all foreign countries, in and to any and all improvements, including the right of priority in, to, and under, the ['114 patent] application" and any patents that ultimately issued therefrom.  (See

---

[1] Synopsys disputes Magma's contention that IBM is a co-owner of the '114 patent. (See Reply at 14-15.)

id. Ex. C.)  The '114 patent was issued on April 23, 2002.  (See id. Ex. M at 1.)

Magma concedes that "van Ginneken is precluded from challenging the patent's validity by the doctrine of assignor estoppel."  (See Opp. at 1.)  Magma argues, however, that it is not in privity with van Ginneken, and, thus, that the doctrine of assignor estoppel does not preclude Magma from challenging the validity of the '114 patent.

**2.  Privity**

As noted, in determining whether privity exists between an inventor/assignor and another entity for purposes of assignor estoppel, the Court must evaluate "all direct and indirect contacts," see Mentor Graphics, 150 F.3d at 1379, and evaluate the relationship between the inventor/assignor and the entity "in light of the act of infringement," see Shamrock Technologies, 903 F.2d at 793.

Here, the following facts are undisputed:  In early 1997, Rajeev Madhavan ("Madhavan") and Karen Vahtra ("Vahtra") decided to start a company to make electronic design automation software for the design of integrated circuits.  (See Madhavan Decl. ¶ 3.)  At the time Magma was incorporated, on April 1, 1997, Madhavan and Vahtra were its only employees.  (See id. ¶ 5.)  Initially, van Ginneken declined Madhavan's invitation to join Magma as an engineer.  (See id. ¶ 6.)  In late April 1997, however, van Ginneken reconsidered and contacted Madhavan to ask if the position was still available.  (See id.)  On April 26, 1997, Magma offered van Ginneken the position of "Principal Engineer, Synthesis," with a starting date of May 15, 1997, which position van Ginneken accepted on April 28, 1997.  (See id. and Ex. EE at 1.)  On May 1, 1997, van Ginneken resigned from Synopsys.  (See Edelman Decl. Ex. E.)  Magma's April 26, 1997 job offer to van Ginneken stated that van Ginneken would have "overall responsibility for the development of timing optimization capabilities," and would report to Magma's Vice President of Engineering, a position then occupied by Madhavan.  (See Madhavan Decl. Ex. EE at 1.)

Moreover, in Magma's responses to Synopsys's requests for admission, Magma admitted that "van Ginneken was a co-founder of Magma" and that "Magma has depended substantially on [his] expertise."  (See Edelman Decl. Ex. F, responses to Requests for

6

Admission Nos. 42-43.) Magma also admitted that "van Ginneken was directly involved in the design and development" of the following Magma products: Blast Fusion, Blast Create, Blast Plan, and Blast Noise. (See id. Ex. F, responses to Requests for Admission Nos. 44-47.) Magma further admitted that it "availed itself of [ ] van Ginneken's knowledge and assistance in the design" of the above-referenced products. (See id. Ex. F, responses to Requests for Admission Nos. 48-51.) In addition, Magma admitted that van Ginneken "was instrumental in taking Blast Fusion from a concept to a production-ready software used worldwide." (See id. Ex. F, response to Requests For Admission No. 18.) Synopsys, in its preliminary infringement contentions, identifies Blast Fusion, Blast Create, Blast Plan, and Blast Noise as Magma products that infringe the '114 patent. (See Simmons Decl. Ex. BB.)[2]

Given these admissions, Synopsys argues, Magma has conceded that Magma availed itself of van Ginneken's knowledge and assistance in creating the allegedly infringing products, and, consequently, that the doctrine of assignor estoppel bars Magma from challenging the validity of the '114 patent. See Intel Corp. v. U.S. International Trade Commission, 946 F.2d at 839 ("What is significant is whether the ultimate infringer availed itself of the inventor's knowledge and assistance to conduct infringement.")

In response, Magma argues that van Ginneken was not a "founder" of Magma in the usual sense, and had no control over Magma because he was not an officer or board member, never managed other Magma employees, and never exercised control over Magma through his stock ownership. (See Opp. at 1; Madhavan Decl. ¶¶ 7, 11.) Madhavan attests that "[c]onsistent with the general practice in Silicon Valley, at Magma the label 'founder' simply refers to those who began working at the company before the first significant financing was closed and received shares at the 'founder' share price." (See id.

---

[2] Synopsys also notes that Magma has admitted that van Ginneken is "a key architect of the patent-pending Fixed Timing methodology, the core technology for all Magma's solutions." (See id. Ex. F at 2:10-24.) There is no evidence before the Court, however, that "Fixed Timing methodology" relates in any way to the invention claimed by the '114 patent.

7

¶ 9.) According to Madhavan, "even junior engineers can be labeled 'founders.'" (See id.) Magma does not contend, however, that van Ginneken was a junior engineer. Rather, Magma acknowledges that, at the time van Ginneken was hired, he was one of only three persons with the title "Principal Engineer." (See id. ¶ 8 and Ex. DD.) Indeed, van Ginneken was identified as a "key employee" in an April 30, 1997 document by which Magma adopted its corporate bylaws. (See id. Ex. DD at 2.)

Magma next argues that van Ginneken did not make a "significant" contribution to the "allegedly infringing portions" of Magma's products. (See Opp. at 7.) As Magma correctly notes, the '114 patent claims various "computer controlled method[s] for placing cells in a placement area" in an integrated circuit. (See Compl. Ex. J ('114 patent) at 2:12-14; 6:56-57, 7:13-15, 8:6-8.)[3] Magma presents evidence that the software that performs the placement is referred to as a "placer." (See Madhavan Decl. ¶ 12.) According to Madhavan, van Ginneken "had only minimal involvement in the development of Magma's placers, was not the architect of Magma's placers, and was not necessary for the development of any Magma placer." (See id. ¶ 13.) Moreover, Madhavan attests, van Ginneken was "never the primary developer of a Magma placer and was never responsible for writing or maintaining any Magma placer." (See id.) According to Madhavan, Hamid Savoj ("Savoj"), who also was a Principal Engineer and founder of Magma, "was the engineer at Magma initially responsible for the development of Magma's placers." (See id.) In addition, Koen van Eijk ("van Eijk"), who joined Magma as a Senior Software Engineer in April 2000, attests that "van Ginneken had no significant involvement in developing or maintaining the source code for Magma's placers" after late 2000, (see van Eijk Decl. ¶ 5), and Joe Hutt, who joined Magma as Vice President of Engineering in May 1998, attests that "[v]irtually none of the software that van Ginneken developed was ultimately utilized in the placers incorporated in Magma products," (see Hutt Decl. ¶ 6.) Hutt also attests that

---

[3] Synopsys argues that the invention claimed by the '114 patent also includes "the performance of synthesis before rough placement, and numerous elements that can occur after placement." (See Reply at 12 (emphasis in original).)

8

Magma has developed multiple placers and that van Ginneken was involved only in the development of the "Eisenmann placer"[4] and "had little, if any, involvement in the development of the other placers." (See id. ¶ 7.)

Magma, however, does not claim that van Ginneken had no involvement in the design and development of the portions of its products that are alleged to infringe the '114 patent. Moreover, Magma does not attempt to retract its admissions that van Ginneken "was directly involved in the design and development" of four of the products alleged to infringe the '114 patent, or that Magma "availed itself of [ ] van Ginneken's knowledge and assistance in the design" of those products. (See Edelman Decl Ex. F, responses to Requests for Admission Nos. 44-51.) Nor does Magma attempt to retract its admission that van Ginneken "was instrumental in taking Blast Fusion," one of the products alleged to infringe the '114 patent, "from a concept to a production-ready software used worldwide." (See id. Ex. F, response to Requests For Admission No. 18.) Moreover, Synopsys has submitted to the Court a document, produced by Magma in discovery, which states that van Ginneken "manages the placement group" at Magma. (See Edelman Reply Decl. ¶ 9 and Ex. H at 0409272; see also id. Ex. I at LVG3 (noting that van Ginneken "managed placement group" while working at Magma).) Finally, van Ginneken has submitted a declaration in which he attests, albeit without specific reference to the '114 patent, that he and Magma "used the inventions that [he] had conceived while employed at Synopsys as a technical foundation for Magma's products" and that Magma "incorporated Synopsys' inventions into Magma's product line." (See van Ginneken Decl. ¶¶ 31, 34.)

Viewed in the light most favorable to Magma, the evidence shows van Ginneken was directly involved in the design and development of four of the products alleged to infringe the '114 patent, and managed the activities of Magma's placement group, but had little direct involvement with the "placers" incorporated in the products that are alleged to infringe that patent.

---

[4] There is no evidence as to whether the Eisenmann placer is used in any of Magma's products that are alleged to infringe the '114 patent.

9

The Federal Circuit, however, has not required that the assignor be personally involved in designing the allegedly infringing aspects of a product before finding the doctrine of assignor estoppel applicable. In Mentor, for example, the Federal Circuit applied the doctrine of assignor estoppel where the assignor, Mentor, had no involvement in the creation of the allegedly infringing product, but only in the marketing of the product. See Mentor, 150 F.3d at 1376. In that case, Mentor had assigned a patent for hardware emulation technology ("the '473 patent") to another company, Quickturn. See id. Thereafter, Mentor bought a company, Meta, which had developed hardware emulation technology independent of Mentor and Quickturn. See id. When Quickturn asserted that Meta's technology infringed the '473 patent Quickturn had purchased from Mentor, Mentor filed an action for a declaratory judgment of invalidity of the '473 patent. See id. at 1377. The Federal Circuit applied the doctrine of assignor estoppel to bar both Mentor and Meta from challenging the '473 patent. See id. at 1378-79.

The Federal Circuit found Mentor was barred because it had assigned the patent to Quickturn for value, and the sales agreement did not reserve to Mentor the right to assert a challenge based on invalidity nor did it include a waiver of Quickturn's right to assert assignor estoppel. See id. at 1378. The Federal Circuit found Meta, likewise, was barred because it was in privity with Mentor, which now owned and controlled Meta's operations.[5] Meta thus was precluded from challenging the '473 patent because the assignor of that patent, Mentor, controlled Meta's current operations, even though Mentor had no role in creating the allegedly infringing technology. In the instant case, although Magma contends van Ginneken, the patent assignor, had little involvement in creating the precise components that are alleged to infringe, Mentor demonstrates that assignor estoppel may apply even where the assignor had no involvement at all in creating the infringing technology.

Nor is control of the allegedly infringing entity a prerequisite. In Intel, the Federal

---

[5] The court found it irrelevant that Meta was merely "continuing the business it was in before the sale" to Mentor. See id.

1  Circuit applied the doctrine of assignor estoppel where there was no finding that the
2  assignor had any control over the entity found to be in privity with him.  See Intel, 946 F.2d
3  at 838-839.  There, the Federal Circuit applied the doctrine of assignor estoppel against
4  two corporations identified collectively therein as GI/M, and barred GI/M from challenging
5  the validity of certain patents owned by Intel relating to Erasable Programmable Read-Only
6  Memories ("EPROMS").  See id.  In so holding, the Federal Circuit based its finding of
7  privity on the following contacts between GI/M and Perlogos, one of the inventors who had
8  assigned the patents to Intel: (1) GI/M was involved in a joint venture to develop EPROM
9  designs and processes with a company, Atmel, that was controlled by Perlegos; (2) Atmel
10 transferred certain EPROM designs and processes to GI/M; (3) the joint venture led to the
11 creation of some of the allegedly infringing EPROMs; (4) Perlegos personally went to Korea
12 to find a company to produce EPROMs for GI/M, and the allegedly infringing EPROMs
13 ultimately were made by that company; (5) Perlegos's company, Atmel, was dependent on
14 GI/M for financing; and (6) Perlegos entered into a personal indemnification agreement with
15 GI/M.  See Intel, 946 F.2d at 838.
16       Significantly, there was no finding that Perlegos had any control over GI/M.  Rather,
17 Atmel was "completely dependent" on GI/M for financing, and GI/M personnel served on
18 Atmel's board of directors.  See id.  Instead of relying on Perlegos' control of GI/M, the
19 Federal Circuit, noting "[w]hat is significant is whether the ultimate infringer availed itself of
20 the inventor's 'knowledge and assistance' to conduct infringement," held "GI/M
21 unquestionably availed itself of the inventor's, and Atmel's[,] knowledge and assistance."
22 See id. at 839.  As that court explained: "The allegedly infringing EPROMs were the
23 product of the Atmel-GI/M joint development program, and the services of George Perlegos
24 were an important component of that program from its inception."  See id.  Similarly, in the
25 instant case, it is undisputed that van Ginneken's knowledge and services were an
26 important component in the development of at least four Magma products that are alleged
27 to infringe the '114 patent.  That van Ginneken lacked control over Magma is not
28

dispositive.[6]

In sum, it is undisputed that van Ginneken assigned the '114 patent to Synopsys for value, that he did not retain the right to challenge the validity of the patent, and that Synopsys did not waive its right to assert assignor estoppel. It is similarly undisputed that van Ginneken then left Synopsys to work for Magma, where he had a key role in developing at least four Magma products that are alleged to infringe the '114 patent, and at least some role in developing the allegedly infringing portions of the products. No more is required for the application of assignor estoppel against Magma. See, e.g., Intel, 946 F.2d at 839.

## CONCLUSION

For the reasons set forth above, Synopsys's motion for partial summary judgment based on the doctrine of assignor estoppel is GRANTED, and the Court hereby GRANTS summary judgment in favor of Synopsys with respect to Magma's fourth and fifth affirmative defenses, and second counterclaim, each of which alleges invalidity of the '114 patent.

This order terminates Docket No. 80.

**IT IS SO ORDERED.**

Dated: July 1, 2005

/s/ Maxine M. Chesney
MAXINE M. CHESNEY
United States District Judge

---

[6] The Court finds unpersuasive the Delaware district court's unpublished decision in Acushnet Co. v. Dunlop Maxfli Sports Corp., 2000 WL 987979 (D. Del. 2000), upon which Magma relies. In that case, the district court would appear to reject application of assignor estoppel in any case where the inventor/assignor lacks control over the company alleged to infringe the assigned patent. See id. at *3. Such holding conflicts with the Federal Circuit's holding in Intel that the key factor is whether the infringing company uses the assignor's knowledge and assistance to conduct infringement. See Intel, 946 F.2d at 141. Indeed, the Federal Circuit found, in Intel, that GI/M was in privity with the inventor/assignor, Perlegos, and thus barred by the doctrine of assignor estoppel from challenging the validity of the assigned patent, where there was no control by the assignor or his company over the estopped entity. Rather, what the Federal Circuit found persuasive was the "closeness of the relationship" among them. See Intel, 940 F.2d at 838.