United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SYNOPSYS, INC.,

        Plaintiff,

  v.

MAGMA DESIGN AUTOMATION, INC.,

        Defendant

_____/

No. C-04-3923 MMC

**ORDER RE: CLAIM CONSTRUCTION OF UNITED STATES PATENTS NOS. 6,453,446, 6,725,438, AND 6,378,114**

Before the Court is the parties' dispute over the proper construction of United States Patents Nos. 6,453,446 ('the '446 patent"), 6,725,438 ("the '438 patent"), and 6,378,114 ("the '114 patent").

**BACKGROUND**

Synopsys alleges that Magma infringes three patents: the '446 patent, titled "Timing Closure Methodology"; the '438 patent, which also is titled "Timing Closure Methodology," and the '114 patent, titled "Method for the Physical Placement of an Integrated Circuit Adaptive to Netlist Changes." (See Second Amended Complaint ("SAC") ¶¶ 92-102.) In the '446 and '438 patents, Lukas van Ginneken ("van Ginneken") is identified as the sole inventor, and in the '114 patent, van Ginneken is identified as a co-inventor. (See id. Exs. H, I, and J at 1.) The '446 and '438 patents identify Magma as the assignee. (See id. Exs. H and I at 1.) The '114 patent identifies Synopsys as the assignee. (See id. Ex. J at 1.)

1   Synopsys alleges that it is the rightful owner of all three patents as a result of a Proprietary

2   Information and Inventions Agreement ("Agreement") that van Ginneken, a former

3   employee of Synopsys, entered into with Synopsys on May 17, 1995.  (See id. ¶¶ 10-18,

4   96-97.)

5   **LEGAL STANDARD**

6   The construction of a patent claim is a matter of law for the court.  See Markman v.

7   Westview Instruments, Inc., 517 U.S. 370, 372 (1996).  As the claim language defines the

8   scope of the claim, the claim construction analysis always begins with the words of the

9   claim.  See Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1324 (Fed. Cir.

10  2002).  The words of a claim are "generally given their ordinary and customary meaning,"

11  and the "ordinary and customary meaning of a claim term is the meaning that the term

12  would have to a person of ordinary skill in the art in question at the time of the invention,

13  i.e., as of the effective filing date of the patent application."  See Phillips v. AWH Corp.,

14  2005 WL 1620331 at *5 (Fed. Cir. July 12, 2005).  "[T]he person of ordinary skill in the art is

15  deemed to read the claim term not only in the context of the particular claim in which the

16  disputed term appears, but in the context of the entire patent, including the specification."

17  "Because the meaning of a claim term as understood by persons of skill in the art is

18  often not immediately apparent, and because patentees frequently use terms

19  idiosyncratically, the court looks to those sources available to the public that show what a

20  person of skill in the art would have understood disputed claim language to mean,"

21  including "the words of the claims themselves, the remainder of the specification, the

22  prosecution history, and extrinsic evidence concerning relevant scientific principles, the

23  meaning of technical terms, and the state of the art."  See id. at *6.  "[T]he context in which

24  a term is used in the asserted claim can be highly instructive."  Id.  In addition, "[b]ecause

25  the claim terms are normally used consistently throughout the patent, the usage of a term

26  in one claim can often illuminate the meaning of the same term in other claims."  See id. at

27  *7.

28  The claims must be read in view of the specification, which is required to "describe

2

the manner and process of making and using" the patented invention in "full, clear, concise, and exact terms."  See id.  at *7, *8.  "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," in which case "the inventor's lexicography governs."  See id. at *8.  "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor," in which case "the inventor's intention, as expressed in the specification, is dispositive."  See id.

"Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  Id. at *9.  The prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes," however, because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of the negotiations."  See id.  "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Id.

In construing the claims of a patent, courts also may consult extrinsic evidence, including "expert and inventor testimony, dictionaries and learned treatises."  See id. at *10. "While extrinsic evidence can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." See id.  Technical dictionaries may help a court "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms."  Id. In addition, "expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."  Id.  Courts should disregard conclusory testimony by experts, however, as well as any expert testimony that is "clearly at odds with the claim construction mandated by the claims themselves, the written

1   description, and the prosecution history[.]"  See id.  "In sum, extrinsic evidence may be

2   useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope

3   unless considered in the context of the intrinsic evidence," i.e., the claim language,

4   specification, and prosecution history.  See id. at *11.

5           An accused infringer may overcome the heavy presumption that a claim term carries

6   its ordinary and customary meaning, "but he cannot do so simply by pointing to the

7   preferred embodiment or other structures or steps disclosed in the specification or

8   prosecution history."  See CCS Fitness v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir.

9   2002).  "Though understanding the claim language may be aided by the explanations

10  contained in the written description, it is important not to import into a claim limitations that

11  are not a part of a claim."  SuperGuide Corp. v. DirecTV Enterprises, Inc., 358 F.3d 870,

12  875 (Fed. Cir. 2004.)  "For example, a particular embodiment appearing in the written

13  description may not be read into a claim when the claim language is broader than the

14  embodiment."  Id.

15                                  **DISCUSSION**

16          The parties dispute the proper claim construction of certain terms used in the claims

17  of the patents at issue.[1]  The Court begins its analysis with the '446 and '438 patents.[2]

18      **A.  The '446 and '438 Patents**

19          The '446 and '438 patents are both titled "Timing Closure Methodology."  The

20  inventions set forth in the '446 and '438 patents "relate generally to the field of integrated

21  circuit design and more specifically to a methodology for meeting timing constraints in the

22  design of digital circuits."  (See '446 patent at 1:29-31.)  The basic building blocks of

23  integrated circuits ("IC") are called "gates" (or "cells"), which are interconnected with each

24

25          [1] Although the '446 and '438 patents were assigned by the inventor to Magma,
26  Magma argues herein for a narrow construction of the disputed claim language, while
    Synopsys argues for a broader construction.

27          [2] The '446 and '438 patents derive from the same patent application and share the
28  same specification.  For ease of reference, when citing to the shared specification of the
    '446 and '438 patents, the Court will cite only to the '446 patent.

other by wires.  (See Harris Decl. ¶ 15; see also Sechen Decl. ¶ 19.)  Each path between
two gates or cells has an associated "delay," which is the amount of time it takes for data to
pass from one end of the path to the other.  (See Harris Decl. ¶ 23; see also Sechen Decl.
¶ 22.)  The delay results from certain electronic characteristics of the gates and wires,
primarily capacitance (or "load").  (See Harris Decl. ¶ 23; see also Sechen Decl. ¶ 22.)  A
gate must have a certain "driving capability" to drive the load "defined by the wires and
gates connected to its input"; if the gate must drive a longer wire (i.e., a longer load) without
incurring additional delay, it must have an increased driving capability.  (See Harris Decl. ¶
23; see also Sechen Decl. ¶ 23.)

    The process of IC design involves logic synthesis and physical design.  (See Harris
Decl. ¶ 16.)  Logic synthesis "refers to the conversion of a high-level circuit description . . .
into a more detailed electronic circuit description such as a 'netlist,' which is a list of cells,
their interconnections, and other information."  (See id. ¶ 17.)  "Physical design refers to the
process of placing and routing gates on an IC to create a 'layout,' which is a detailed
blueprint describing the actual physical dimensions of the circuit elements (e.g., gates and
wires) to be formed on the chip."  (See id. ¶ 18.)  The placement step includes determining
physical locations on the chip for all cells in the netlist; the routing step includes
determining the routes of the wires connecting the cells.  (See id. ¶¶ 18-19; see also
Sechen Decl. ¶¶ 18-20.)  The goal of IC designers is to design an IC that is "small, yet
powerful and fast."  (See Harris Decl. ¶ 20.)

    In the conventional IC design process, the size of each cell is chosen at the outset
and remains constant once chosen.  (See '446 patent at 1:20-34.)  During placement, the
"net (wire) lengths of the circuit are estimated," but said lengths are difficult to estimate
accurately.  (See id. at 1:26-27, 1:34-36.)    Under the conventional process, "[t]his difficulty
in accurately predicting net lengths leads to unpredictable delay effects after cell placement
occurs."  (See id. at 1:41-42.)  "For example, some nets turn out to be longer in length than
expected."  (Id. at 1:42-44.)  "These longer nets cause longer delays which prevent
satisfaction of timing constraints in the digital circuit."  (Id. at 1:44-46.)  "Thus, under the

1   conventional design approach, timing closure [i.e., satisfaction of timing constraints] is not

2   certain until after placement."  (Id. at 1:46-47.)  "Failure to achieve timing closure after

3   placement leads to additional expenses and other problems for the designer."  (Id. at 1:48-

4   49.)

5       The inventions set forth in the '446 and '438 patents are designed to overcome this

6   deficiency in the conventional process.  (See id. at 3:11-14.)  In general terms, the

7   invention abandons the conventional technique of beginning the design process with cells

8   of fixed sizes, and instead begins the design process by using delays to determine the size

9   and placement of cells.  (See, e.g., id., Abstract and 3:16-41.)

10                          **1.  "Step Plus Function"**

11      As an initial matter, the parties dispute whether subsection (a) of claim 1 of the '446

12  patent is a "step-plus-function" claim subject to 35 U.S.C. § 112, ¶ 6, which provides:

13          An element in a claim for a combination may be expressed as a means or a
            step for performing a specified function without the recital of structure,
14          material, or acts in support thereof, and such claim shall be construed to
            cover the corresponding structure, material, or acts described in the
15          specification and equivalents thereof.

16  35 U.S.C. § 112, ¶ 6.  Under this provision, an inventor "can describe an element of his

17  invention by the result accomplished or the function served, rather than describing the item

18  or element to be used (e.g., 'a means of connecting Part A to Part B,' rather than 'a

19  two-penny nail')."  See Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S.

20  17, 27 (1997).

21      The statute "can apply not only to a combination of mechanical elements, but also to

22  'a combination of . . . steps in a process claim.'"  See Masco Corp. v. United States, 303

23  F.3d 1316, 1326 (Fed. Cir. 2002).  The Federal Circuit has held that the statute permits "an

24  element in a combination method or process claim [to] be recited as a step for performing a

25  specified function without the recital of acts in support of the function."  See O.I. Corp. v.

26  Tekmar Co. Inc., 115 F.3d 1576, 1583 (Fed. Cir. 1997).  "The price that must be paid for

27  use of that convenience," however, is that "such a claim covers only the specific acts

28  recited in the specification for performing that function, and equivalent acts."  See id.; see

6

1   also Seal-Flex, Inc. v. Athletic Track and Court Construction, 172 F.3d 836, 850 (Fed. Cir.

2   1999) (Rader, J., concurring).

3          There is a presumption that the claims are in step-plus-function format when the

4   drafter uses the term "steps for." See Masco, 303 F.3d at 1326. By contrast, where the

5   claim employs the term "steps of," there is no presumption that the claims are in step-plus-

6   function format, see id. at 1327, because "[m]ethod claims necessarily recite the steps of

7   the method, and the preamble words that 'the method comprises the steps of' do not

8   automatically convert each ensuing step into the form of § 112 ¶ 6." See Cardiac

9   Pacemakers, Inc. v. St. Jude Medical, Inc., 381 F.3d 1371, 1382 (Fed. Cir. 2004). "[W]here

10  a method claim does not contain the term 'step[s] for,' a limitation of that claim cannot be

11  construed as a step-plus-function limitation without a showing that the limitation contains no

12  act." See Masco, 303 F.3d at 1327.[3]

13         "[E]ven where the drafter employs the "step for" language," however, "'section 112,

14  ¶ 6 is implicated . . . only when steps plus function without acts are present'" in the claim

15  language. See Masco, 303 F.3d at 1326 (quoting O.I. Corp.,115 F.3d at 1582) (ellipses

16  and emphasis in original). If the claim language sets forth an act to perform the desired

17  function, then the claim is not in step-plus-function format. See id. at 1327. In addition,

18  "[m]erely claiming a step by itself, or a series of steps, without recital of a function does not

19  trigger the application of § 112, paragraph 6." Epcon Gas Systems, Inc. v. Bauer

20  Compressors, Inc., 279 F.3d 1022, 1028 (Fed. Cir. 2002).

21         "Only a few cases have found the existence of a step-plus-function claim element."

22  See Seal-Flex, 172 F.3d at 850 n.5 (Rader, J., concurring) (citing In re Roberts, 470 F.2d

23  1399 (CCPA 1973) and Ex Parte Zimmerley, 153 U.S.P.Q. 367 (BPA 1966)). In Roberts,

24

25         [3] "[T]he 'underlying function' of a method claim element corresponds to what that
26  element ultimately accomplishes in relationship to what the other elements of the claim and
    the claim as a whole accomplish. 'Acts,' on the other hand, correspond to how the function
27  is accomplished." See Masco, 303 F.3d at 1327 (quoting Seal-Flex, 172 F.3d at 849-50
    (Rader, J., concurring) (emphasis in original)); see also O.I. Corp., 115 F.3d at 1583-84
28  ("We interpret the term 'steps' to refer to the generic description of elements of a process,
    and the term 'acts' to refer to the implementation of such steps.").

the claim language at issue provided: "The method of corrugating polyethylene terephthalate film which comprises shaping said film at a temperature in the range of about 100º to 175º C. by pressing said film between two coacting rotating surfaces and reducing the coefficient of friction of the resulting film to below about 0.40 as determined by the Bell test." See Roberts, 470 F.2d at 1400.  The Court of Customs and Patent Appeals held that the phrase "reducing the coefficient of friction of the resulting film to below about 0.40" fell within the scope of § 112 ¶ 6 (then codified as § 112 ¶ 3) because of "the absence in the claim of specific steps which would bring about the desired friction property." See id. at 1402-03.  In Zimmerley, a lengthy process claim set forth a number of steps, including "raising the pH of the resulting pulp to about 5.0 to precipitate dissolved molybdenum trihydroxide, leaving the ferrous iron values in solution." See Zimmerley, 153 U.S.P.Q. at 368.  The Patent Office Board of Appeals held that this claim language fell within the scope of § 112 ¶ 6 (then codified as § 112 ¶ 3) and, accordingly, there was no need for the claim to "recite a specific way of raising the pH." See id. at 369.

Here, claim 1 of the '446 patent states:

> An automated method for designing an initial integrated circuit layout of a digital circuit with a computer, based upon an electronic circuit description and by using a cell library containing cells, comprising the steps of:
>
> (a) selecting a plurality of cells from the cell library that are intended to be coupled to each other with a plurality of wires and that can be used to implement the digital circuit based on the electronic circuit description input to the computer to obtain a selected plurality of cells, at least some of the selected plurality of cells having an initial intended delay associated therewith for ensuring that predetermined timing constraints are met;
>
> (b) determining a placement of the selected plurality of cells and the wires coupled thereto using a sequence of instructions from the computer program; and
>
> (c) determining the area of the some cells, the area of each some cell being determined using the lengths of the wires coupled to each of said some cells such that the initial intended delay of each some cell is realized, the length of each wire being determined by the placement of the cells coupled to that wire.

('446 patent at 17:14-35.)  As noted, the parties dispute whether subsection (a) is stated in step-plus-function format.

8

Because claim 1 uses the phrase "steps of" rather than "steps for," there is no presumption that subsection (a) is in step-plus-function format.  See Masco, 303 F.3d at 1326-27.  Because the claim "does not contain the term 'step[s] for,' a limitation of that claim cannot be construed as a step-plus-function limitation without a showing that the limitation contains no act."  See id. at 1327.  In subsection (a), the claim specifies the act of "selecting a plurality of cells from the cell library . . . at least some of the selected plurality of cells having an initial intended delay associated therewith" as a way of achieving the specified function, in particular, "ensuring that predetermined timing constraints are met." (See '446 patent at 17:18-26.)  As subsection (a) includes both a function and an act, it is not in step-plus-function format.  See Masco, 303 F.3d at 1327.

### 2.  Disputes as to specific claim terms

### a.  Initial intended delay

| Disputed Claim Language | Synopsys's Proposed Construction | Magma's Proposed Construction |
| --- | --- | --- |
| Initial intended delay | a delay set as a target | delay determined during library analysis that is intended to be maintained constant prior to and after placement/routing |

The phrase "initial intended delay" appears in claims 1, 8, 12, 13, 14, 16, 21, 35, 43, 49, and 50 of the '446 patent.  (See '446 patent at 17:14-35, 1:65-67, 18:14-28, 18:32-35, 18:45-63, 19:51-20:8, 20:37-21:18, 22:1-12.)  In claim 1, for example, the phrase appears twice, specifically, in subsection (a), which requires that "at least some of the selected plurality of cells" have "an initial intended delay associated therewith for ensuring that predetermining timing constraints are met," and, thereafter, in subsection (c), which requires "determining the area of the some cells, the area of each some cell being determined using the lengths of the wires coupled to each of said some cells such that the initial intended delay of each some cell is realized[.]" (See id. at 17:23-25, 17:30-33.)  The key disputes between the parties concern (1) when the "initial intended delay" is selected, and (2) whether the "initial intended delay" must remain constant once selected, or whether the selected delay may be modified at some point in the process.

9

1      The phrase "initial intended delay" appears nowhere in the specification.

2   As Synopsys points out, however, the use of the word "initial" suggests that the intended

3   delay may be revised at some point in the process.  Indeed, an entire section of the

4   specification addresses the "stretching" and "compressing" of gate delays.  (See '446

5   patent at 14:19-15:61.)  In particular, "[p]rior to cell placement, the delays of the individual

6   gates may be stretched or compressed to meet the delay constraints[.]" (See id. at 14:21-

7   23.)  Moreover, claims 12 through 16 of the '446 patent expressly refer to the "stretching" or

8   "compressing" of the "initial intended delay."  (See id. at 18:14-35.)  As Synopsys points

9   out, any definition of "initial intended delay" that requires the delay to be fixed once chosen

10  runs afoul of the plain language of the claims.

11      Magma's proposal that the "initial intended delay" must remain fixed once selected is

12  based on language describing one embodiment of the invention.  (See id. at 6:33-57.)  In

13  particular, the specification, in describing such embodiment, states that "[d]uring the library

14  analysis 207, the delay D is determined for each gate to be used in the digital circuit," (see

15  id. at 6:33-34), and "the gate size is adjusted after cell placement based on changes in the

16  capacitive load in order to maintain D as 'constant.'" (See id. at 6:48-51.)  The specification,

17  however, expressly provides that descriptions of particular embodiments are "illustrative

18  only and not in any way limiting" and that "[o]ther embodiments of the invention will readily

19  suggest themselves to those skilled in the art."  (See id. at 4:55-58.)  Given that portions of

20  the specification, as well as the claims themselves, discuss "stretching" or "compressing"

21  the "initial intended delay," the Court agrees with Synopsys that any construction of "initial

22  intended delay" that precludes changes to the delay once selected would be erroneous.[4]

23  See Phillips v. AWH Corp., 2005 WL 1620331 at *15 ("although the specification often

24  describes very specific embodiments of the invention, we have repeatedly warned against

25  confining the claims to those embodiments").

26

27      [4] At his deposition, Magma's expert, Carl Sechen, Ph.D. ("Dr. Sechen"), conceded
     there is "a possibility" that an initial intended delay could be revised after it is selected.
28  (See Boyce Decl. Ex. A (Sechen Dep.) at 35:15-23.)

1    For the same reason, the Court disagrees with Magma's proposal that the "initial

2    intended delay" must be determined during "library analysis."  Although a discussion of

3    "library analysis" appears in the specification in a description of a particular embodiment of

4    the invention, (see '446 Patent at 6:26-9:9), the term "library analysis" appears in none of

5    the claims.  Moreover, the claims themselves suggest that the determination of the "initial

6    intended delay" may occur at different stages of the process.  For example, claim 1

7    requires that cells be selected from a cell library, and that "at least some of the selected

8    plurality of cells" have "an initial intended delay associated therewith."  (See id. at 17:14-

9    25.)  Claim 21, on the other hand, requires that cells be "selected from a cell library" and

10   that "the electronic circuit description include[ ] an initial intended delay associated with

11   each cell."  (See id. at 18:45-56.)  Synopsys's expert, David Harris, Ph.D. ("Dr. Harris"),

12   attests that it is well known to those of ordinary skill in the art that the "initial intended delay"

13   may be included in or derived from either the electronic circuit description or library

14   analysis.  (See Harris Decl. ¶ 32.)  According to Dr. Harris, Magma's proposed construction

15   renders claims 21 "self-contradictory," because "an 'initial intended delay' cannot be

16   'determined during library analysis' and also be included within the 'electronic circuit

17   description.'" (See id. ¶ 49.)  Indeed, the specification supports Dr. Harris's view by

18   expressly stating that library analysis "is not dependent on the actual circuit which is being

19   synthesized and thus can be performed separately from the circuit design process[.]" (See

20   '446 Patent at 6:30-33.)  Dr. Harris further attests that it would make "no sense, in light of

21   the purpose of the invention, to require that the 'initial intended delay' be obtained during

22   library analysis," because "[t]he invention would work just fine for its intended purpose

23   regardless of whether the initial intended delay is specified in the netlist, the delay is

24   calculated during library analysis, or the delay is obtained in some other manner."  (See id.

25   ¶ 50.)  For all of these reasons, the Court finds there is no limitation that the "initial intended

26   delay" be determined during library analysis.

27       By contrast, Synopsys's construction of "initial intended delay" as a "delay set as a

28   target" comports with the ordinary meaning of the claim language and the specification.  As

11

noted, both the specification and the claims discuss stretching and compressing the "initial intended delay," as necessary, (see, e.g., '446 Patent at 14:19-15:62, 18:14-35), which demonstrates that the "initial intended delay" is an estimate or target, rather than a fixed requirement.  The Court also notes that the specification discusses the "initial intended area" of the cells and the "initial intended lengths" of the wires connecting the cells, both of which are subject to change, (see, e.g., '446 Patent at 3:30-37), which further suggests that the "initial intended delay" also may change once selected.

Accordingly, the Court will construe "initial intended delay" as "a delay set as a target."

### b.  Relative delay value

| Disputed Claim Language | Synopsys's Proposed Construction | Magma's Proposed Construction |
|---|---|---|
| Relative delay value | a delay value set as a target that may be adjusted relative to another value, such as timing constraints | delay determined during library analysis that is intended to be maintained constant prior to and after placement/routing |

The phrase "relative delay value" appears in claims 28, 29, 51 and 52 of the '446 patent and claims 1, 12, 13, 14 and 16 of the '438 patent.  (See '446 Patent at 19:24-34, 22:13-31; see also '438 Patent at 17:8-27, 18:26-38, 18:42-45.)  Magma contends that "relative delay value" has the same meaning as "initial intended delay," while Synopsys contends that the two terms have different meanings.

Other than claim 1 of the '438 patent, each of the claims that contains the term "relative delay value" mentions "stretching" or "compressing" the "relative delay value" of a cell.  (See '446 Patent at 19:24-34, 22:13-31; see also '438 Patent at 18:26-38, 18:42-45.)  For example, claim 28 of the '446 patent requires the step of "stretching the associated relative delay value of a selected cell after the step of placing and before the step of determining the area."  (See '446 Patent at 19:26-28.)  Claim 1 of the '438 patent, by contrast, does not provide for any change to the "relative delay values."  (See '438 Patent at 17:8-27.)

As an initial matter, the Court notes that "'different words or phrases used in

12

1   separate claims are presumed to indicate that the claims have different meanings and

2   scope.'" See Seachange Int'l, Inc. v. C-Cor, Inc., 413 F.3d 1361, 1368 (Fed. Cir. 2005)

3   (quoting Karlin Technology Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971-72 (Fed. Cir.

4   1999)).  Because the claims of the '446 patent include both the phrases "initial intended

5   delay" and "relative delay value," it is presumed that the two phrases have different

6   meanings.  "However, the doctrine only creates a presumption that each claim in a patent

7   has a different scope; it is not a hard and fast rule of construction" and cannot be used to

8   "broaden claims beyond their correct scope, determined in light of the specification and the

9   prosecution history and any relevant extrinsic evidence."  See id. at 1369 (internal

10  quotations and citations omitted).

11          As Magma correctly points out, the '446 patent application was amended in May

12  2000 to replace, in some instances, the phrase "relative delay value" with the phrase "initial

13  intended delay."  (See Huffsmith Decl. Ex. 17 at SY002223.)  Magma contends that this

14  substitution indicates the two phrases have the same meaning.[5]  Magma also points out

15  that references to "relative delay value" in the dependent claims of the '446 patent are

16  based on independent claims that appear to use the phrase "initial intended delay" to

17  describe the same thing.  Specifically, claim 21 of the '446 patent refers to "an initial

18  intended delay associated with each cell" and contains no reference to "relative delay

19  value," (see '446 Patent at 18:55-56), while dependent claims 28 and 29 describe,

20  respectively, stretching or compressing "the associated relative delay value of a selected

21  cell," and make no mention of "initial intended delay."  (See id. at 19:24-33.)  The Court

22  agrees that "relative delay value" in dependent claims 28 and 29 appears to refer to the

23  "initial intended delay" set forth in independent claim 21.  Similarly, independent claim 49

24  refers to "computing the initial intended delay value of each cell based on the initial

25  intended gain value," while dependent claims 51 and 52 discuss changing the gain value in

26

27          [5] At his deposition, Dr. Sechen testified that "initial intended delay has units of time,
    whereas the relative delay value is unitless," but further testified that the difference in
28  measurement of the two terms did not constitute a difference in meaning.  (See Boyce
    Decl. Ex. A (Sechen Dep.) at 80:3-15, 85:5-86:1.)

order to change "the associated relative delay value of said cells."  (See id. at 22:7-8, 13-20.)  The Court agrees with Magma that "relative delay value" in claims 51 and 52 appears to refer to the "initial intended delay" set forth in independent claim 49.

Moreover, the only reference in the specification to "relative delay" appears in the "Summary of the Invention" section, which states that the invention "broadly provides a method for designing an integrated circuit layout based upon an electronic circuit description and by using a cell library containing cells that each have an associated relative delay value[.]" (See id. at 3:17-21.)  The summary of the invention further provides that "the initial intended area of at least some of the selected plurality of cells" is "determined using the associated relative delay value of the selected cell and the initial intended lengths of some of the wires coupled to the selected cell[.]" (See id. at 3:31-35.)  Other than in the language of the claims, no other reference to "relative delay value" appears in the '446 or '438 patents.  Although Synopsys argues that "relative delay value" is "not an initial delay at all, but rather is a delay that has already been adjusted 'relative to' another value such as the timing constraints in the circuit," (see Reply at 10), the claim language, as well as the above-cited language from the specification, contradicts Synopsys's argument.  In particular, claim 1 of the '438 patent makes no reference to adjusting the "relative delay value"; rather, it notes that the cells in a cell library already have "an associated relative delay value" when selected from the library, and that the "area" of some of the selected cells is adjusted based on the "relative delay value" of those cells in order meet predetermined timing constraints.  (See '438 Patent at 17:8-28.)  The Court finds there is no distinction in the patent between the "initial intended delay" and the "relative delay value."[6]

Accordingly, the Court will construe "relative delay value" in the same manner as it

---

[6] Synopsys concedes that the terms "initial intended delay" and "relative delay value" are "at least similar," as its proposed constructions of the two terms and its own expert's testimony demonstrate.  (See Harris Decl. ¶ 93 ("It appears that the parties are in agreement that the 'relative delay value' is at least similar to the 'initial intended delay' set forth in the claims of the '446 Patent.")

14

construed "initial intended delay": "a delay set as a target."

### c. Realized

| Disputed Claim Language | Synopsys's Proposed Construction | Magma's Proposed Construction |
|---|---|---|
| Realized | the delay obtained is less than or approximately equal to the initial intended delay | the initial intended delay of each [some] cell is achieved |

Four of the independent claims of the '446 patent, claims 1, 21, 35, and 43, require that the area of some cells be determined so that the "initial intended delay" of said cells is "realized."[7]  (See '446 Patent at 17:33, 18:62-63, 20:5-6, 20:58-21:11.)  The parties' dispute as to the construction of the term "realized" is based on a disagreement as to whether the initial intended delay must be achieved exactly or whether a faster than anticipated delay is sufficient to "realize" the initial intended delay.  Magma contends that the initial intended delay must be "achieved" to be "realized," while Synopsys contends that the initial intended delay is "realized" if "the delay obtained is less than or approximately equal to the initial intended delay."

The purpose of "realizing" the "initial intended delay" is to ensure that "predetermined timing constraints are met."  (See '446 Patent at 17:23-25, 19:59-61.)  The specification of the '446 patent recognizes that timing constraints may be met when the delay is less than intended.  It expressly notes that in the prior art, one way of "increasing the probability of meeting timing constraints" is to make the size of the gates larger than necessary, (see id. at 1:61-2:3), and further notes that although such an approach "increases the probability of meeting timing constraints," gates that are "larger than the necessary size are wasteful in both silicon area and power consumption," (see id. at 1:63-2:1).  The invention set forth in the '446 patent is intended to address this problem, (see id. at 3:12-13), by permitting the size of each cell to be adjusted during or after placement to more closely achieve the desired delay.  (See id. at 16:24-26.)  Nothing in the specification,

_____

[7] Dependent claims 12 through 16 permit the "initial intended delay" to be "stretched" or "compressed" prior to determining the area of the cells.  (See id. at 18:14-35.)

1  however, requires that the cell size be adjusted to exactly achieve the initial intended delay.

2  Indeed, the specification recognizes that timing constraints are met if "slack is zero or

3  positive,"[8] (see id. at 13:29-30), and further provides that "it is preferable to maintain a

4  small amount of slack for a path, in order to compensate for downstream delay effects,

5  such as wire delay." (See id. at 15:44-46.)[9]

6       Accordingly, the Court agrees with Synopsis that the "initial intended delay" is

7  "realized" if "the delay obtained is less than or approximately equal to the initial intended

8  delay."

9  **d.  Assigned in buckets**

| Disputed Claim Language | Synopsys's Proposed Construction | Magma's Proposed Construction |
|---|---|---|
| Assigned in buckets | assigned to areas in which items are stored or contained, such as partitions or sectors of a placement area | assigned to fixed-sized two-dimensional regions of the chip area |

14       The phrase "assigned in buckets" appears in claims 17 and 31 of the '446 patent

15  and claim 17 of the '438 patent.  Claim 17 of the '446 patent states: "The automated

16  method of claim 1 wherein a group of said some cells are assigned in buckets and

17  operated upon." (See '446 Patent at 18:36-37.)  Claim 31 states: "The automated method

18  of claim 21 wherein a group of said some cells are assigned in buckets and operated upon

19  in order to determined [sic] the initial intended area of each of the group of said some

20  cells." (See id. at 19:38-41.)  Claim 17 of the '438 patent states: "The automated method of

21  claim 1 wherein a group of said some cells are assigned in buckets and operated upon in

22  order to determined [sic] the initial intended area of each of the group of said some cells."

23  (See '438 Patent at 18:46-49.)

24       The only discussion of "buckets" in the specification appears in a section of the

25

26      [8] Dr. Harris attests that "[s]lack is the difference between the actual path delay and the maximum path delay permitted by the timing constraint." (See Harris Decl. ¶ 71.)

27      [9] The Court notes that Magma's own expert, Dr. Sechen, testified that "there's a

28  certain goal, . . . a certain timing constraint, and then you have to be below it, at or below it." (See Boyce Decl. Ex. A (Sechen Dep.) at 32:8-13.)

1   specification that discusses cell placement in one embodiment of the invention.  (See '446

2   Patent at 15:65-16:22.)  In such discussion, the specification states:

> In step 225 (FIG. 4), the placement of cells is performed. FIGS. 10A and 10B
> show how a circuit design is transformed from a logical hierarchy 830 to a
> physical hierarchy 832 during the cell placement step 225 (FIG. 4). In the
> physical hierarchy 832, the intermediate logic levels in the logical hierarchy
> 830 are associated in or grouped in buckets 834 wherein each bucket 834
> holds, for example, about one-hundred (100) cells 836. The buckets 834 are
> arranged in an array as shown in FIG. 10C. If the designer chooses to keep a
> group of cells 836 together, then the group of cells 836 are grouped in the
> same buckets 834 or in neighboring buckets. Preferably, a bucket 834 is
> sized small enough such that cell placement within a bucket 834 has an
> insignificant effect on timing. In other words, the size of a bucket 834 is such
> that the wire delay in a bucket 834 can be ignored. However, the size of a
> bucket 836 should be large enough to accommodate remapping and resizing
> of the cells 836 contained in the bucket. The number of cells which can be
> placed within a bucket can range, preferably, from about 20 cells to about 200
> cells.
>
> Pre-routes and pre-places (for driving the placer and global router) are driven
> into the bucket 834 structure. It is further noted, however, that the present
> invention may be practiced or incorporated with conventional placement
> methods and systems.

(See id.)

Dr. Harris attests, referring to three technical dictionaries, that "bucket" is a term of

art in the computer science industry that has been defined as "an area of storage that may

contain more than one record," "a storage cell in which data may be accumulated," and

"[a]n area of storage where items with a common property are stored."[10]  (See Harris Decl.

¶ 76 and Exs. H, N, and O.)  Dr. Harris further attests that the use of the term "buckets" in

the specification is "entirely consistent with the normal dictionary definition of the term

'buckets.'" (See id. ¶ 79.)

In the instant patent, "buckets" are used in the course of placement of cells on an

integrated circuit.  (See '446 Patent at 15:65-16:22.)  Said placement is part of the process

of transforming the "logical hierarchy" of the chip to a "physical hierarchy." (See id, at

---

[10] Magma's expert, Dr. Sechen, attests that the definitions cited by Dr. Harris "relate
to computer storage or memory and are not useful for understanding the meaning of the
term 'buckets' in the context of the '446 patent." (See Sechen Decl. ¶ 56.)  Magma's
proposed construction, however, although purportedly tethered solely to the language of
the specification, (see Magma Mem. at 13), is, as discussed infra, unpersuasive.

15:65-16:1.)  According to Dr. Harris, the term "hierarchy" indicates a subdivision of a complex whole into multiple simpler pieces, and the term "physical hierarchy" is "a hierarchy applied to the layout of an integrated circuit."  (See Harris Decl. ¶ 79 and n.1.)  Dr. Harris further attests that, "[a]s is known to one of ordinary skill in the art, the physical hierarchy is a subdivision of the whole placement area into partitions or sectors."  (See id.)  Synopsys's proposed construction of "buckets" as "areas in which items are stored or contained, such as partitions or sectors of a placement area" thus applies the standard technical dictionary definition of "bucket" and applies it to the specific field of integrated circuit design.[11]

Magma's proposed claim construction, requiring "buckets" to be "fixed-sized two-dimensional regions of the chip area," is not supported by the claim language, the specification, or the dictionary definitions cited by Dr. Harris.  Magma relies on the statement in the specification that the buckets "are arranged in an array as shown in FIG. 10C," and points to the uniform grid set forth in that figure as evidence that the buckets must be both fixed in size and arranged in a two-dimensional array.  (See '446 patent at 16:5-6 and Fig. 10C.)  Although Figure 10C is the only figure in the '446 patent depicting the arrangement of buckets on a chip, nothing in the specification requires that the buckets be either fixed in size, or arranged in a two-dimensional array.  As noted, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  See Phillips v. AWH Corp., 2005 WL 1620331 at *15.

Accordingly, the Court will adopt Synopsys's proposed construction and will construe

---

[11] Dr. Harris also points out that another Magma patent, in which van Ginneken likewise is a listed inventor, discusses grouping cells in buckets and defines "buckets" as "sectors in the placement area."  (See id. ¶ 81 and Ex. P (United States Patent No. 6,230,304 ('304 patent)) at 7:32-35.)  There is no argument that the prosecution history of the '304 patent has any relationship to the prosecution of the '446 patent and, consequently, the Court is hesitant to define a term in the '446 patent by reference to the usage of such term in another, unrelated, patent.  Nonetheless, the Court agrees with Dr. Harris that the usage of the term "bucket" in the '304 patent comports with the technical dictionary meaning of the term, and nothing in the specification of the '446 patent suggests that a non-standard meaning of "bucket" was contemplated by the inventor.

1  "assigned in buckets" as "assigned to areas in which items are stored or contained, such as

2  partitions or sectors of a placement area."

3  **B. The '114 Patent**

4  The '114 patent is titled "Method For the Physical Placement of an Integrated Circuit

5  Adaptive to Netlist Changes."  The invention set forth in the '114 patent "relates to a

6  method for the physical placement of an integrated circuit chip that is adaptive to changes

7  made to a netlist."  (See '114 Patent at 1:7-9.)

8  As set forth in the "Background" section of the '114 patent, the design of any

9  integrated circuit typically "begins with an engineer conceiving and defining the

10  performance specification of the new IC chip."  (See id. at 1:27-29.)  "A high level language

11  is used to translate this specification into functional criteria which are fed into a logic

12  synthesis program," which "generates a netlist containing a collection of gates," also known

13  as "cells."  (See id. at 1:29-32.)  The netlist "can be regarded as a template for the

14  realization of the physical embodiment of the integrated circuit in terms of transistors,

15  routing resources, etc."  (See id. at 1:34-36.)  "Next, a physical design tool is used to place

16  and route the IC chip" by determining "the physical pinouts, wiring, interconnections and

17  specific layout of the semiconductor chip."  (See id. at 1:1:37-40.)

18  "As the complexity, functionalities, speed, and size of these chips increase, it is

19  becoming a much more critical and difficult task to properly design, layout, and test the next

20  generation of chips."  (See id. at 1:50-54.)  The '114 patent notes the following problems

21  with the processes described in the prior art:

22  Often, several iterations of the design, layout, and testing process are
   required in order to optimize the semiconductor chip's size, cost, heat output,
23  speed, power consumption, and electrical functionalities. However, one
   problem is attributable to the fact that each of these stages is highly
24  dependent on the results of the other stages. A minor alteration in one stage
   intended to enhance one characteristic may cause unforeseen problems to
25  occur in other stages. For example, changing a cell in the synthesis stage
   might drastically alter the current place and route. It is this high degree of
26  interdependence which makes it extremely difficult to predict and account for
   the consequences associated with any changes. Indeed, the overall design
27  might sometimes be worse in a successive iteration. Furthermore, the
   iterative process is time-consuming and requires a powerful computer to
28  perform the processing. In addition, the iterative process is labor intensive

19

1  and requires the dedication of a highly skilled, experienced EDA specialist.

2  (See id. at 1:54-2-4.)  The invention set forth in the '114 patent is intended to "cut[ ] the cost

3  and time associated with the semiconductor chip design process, while at

4  the same time, allow[ing] a designer to optimize the chip's performance."  (See id. at 2:5-9.)

5      The '114 patent summarizes the invention as follows:

6      The present invention pertains to a computer controlled method for the rough
       placement of cells in the design of integrated circuits. Initially, a synthesis tool
7      is used to generate a netlist according to HDL,[12] user constraint, and
       technology data. Thereupon, a cell separation process assigns (x,y) locations
8      to each of the cells. The cell location information is supplied to the synthesis
       tool, which can then make changes to the netlist thereto. In the present
9      invention, the size of the placement area is allowed to be scaled according to
       the new netlist. Next, the cells of the netlist are spaced apart according to a
10     spacing algorithm. A partitioning algorithm is then applied to group the cells
       into a plurality of partitions. A number of iterations of cell separation,
11     synthesis of new netlist, size adjustment (if necessary), spacing, and
       partitioning are performed until the cells converge. Thereupon, detailed
12     placement and routing processes are used to complete the layout.

13  (See id. at 2:12-28.)  During the prosecution of the '114 patent, the inventors stated:  "The

14  significance of this invention is that by allowing netlist changes to be entered during the

15  rough placement process, the overall number of iterations required for the design of

16  integrated circuits is minimized."  (See Harris Decl. Ex. Y at 6.)

17      **1. Convergence criterion based upon a partition size**

18
19

| Disputed Claim Language | Synopsys's Proposed Construction | Magma's Proposed Construction |
|---|---|---|
| Convergence criterion based upon a partition size | a condition based upon a partition size that would, if satisfied, achieve a predetermined result | condition for terminating an iterative process based on the number of cells contained in a partition |
| Partition size | Number of cells in a partition or the total area of cells in a partition | Number of cells contained in a partition |

20
21

22

23
24  The phrase "establishing a convergence criterion based upon a partition size"

25  appears in claims 1, 6, and 11 of the '114 patent.  For example, claim 1 states:

26      In the design of integrated circuits, a computer controlled method for placing
       cells in a placement area, comprising:
27     generating a netlist through a synthesis process;

28  ———————————————
       [12] "HDL" stands for "hardware design language."  (See id. at 4:64.)

> establishing a convergence criterion based upon a partition size;
> executing a cell separation process according to the netlist;
> changing the netlist in response to how the cells are placed;
> modifying the spacings of the cells responsive to changes made to the netlist;
> partitioning the cells into a plurality of partitions; and,
> determining whether the partitions meet said criterion for convergence.

(See '114 Patent at 6:56-7:3.)  The key disputes between the parties with respect to the construction of this term relate to (1) whether "partition size" is limited to the number of cells contained in a partition or whether it also encompasses the total area of cells in a partition, and (2) whether "convergence criterion" applies only to an iterative process or whether it can apply to a process that can be completed in only one attempt.

In the preferred embodiment of the invention, a five-step process occurs during the "rough placement process."  (See id. at 3:8-15, 3:47.)  The five steps are (1) cell separation, (2) changing the netlist, (3) changing the spacings, (4) partitioning the cells, and (5) determining whether the then-current placement "has successfully converged."  (See id. at 3:14-61.)  In the fourth step, according to the specification, "[p]artitioning refers to the process of subdividing the cells in order to better 'spread' them apart."  (See id. at 3:48-49.)  In step four, "the partitions are defined"; then, in step five, "a determination is made as to whether the current placement has successfully converged."  (See id. at 3:47, 3:52-54.)  In the preferred embodiment,

> Convergence is achieved when each of the partitions reaches a pre-determined size. For example, the user can set the convergence point to occur whenever each of the partitions is comprised of less than twenty gates.

(See id. at 3:54-57.)  If convergence has not been reached, the first four steps are repeated.  (See id. at 3:57-58.)  "Otherwise, once convergence has been achieved, the detailed placement and route process is performed to complete the physical layout."  (See id. at 3:59-61.)

Although the description of the preferred embodiment cited above describes the size of the partitions by reference to the number of gates or cells contained therein, nothing in the specification requires partitions to be measured in that manner.  See Phillips v. AWH Corp., 2005 WL 1620331 at *15 ("[A]lthough the specification often describes very specific

21

1    embodiments of the invention, we have repeatedly warned against confining the claims to

2    those embodiments.")  Indeed, the claims demonstrate that measuring the size of the

3    partitions by reference to the number of cells contained therein is only one method of

4    measuring the size of the partitions.  In particular, independent claim 1 states that the

5    convergence criterion is "based upon a partition size," without stating any particular method

6    of determining partition size; the only difference between independent claim 1 and

7    dependent claim 5 is that in claim 5, "the partition size is measured by the number of gates

8    contained therein."  (Compare '114 Patent at 6:56-7:3 (claim 1) with id. at 7:11-12 (claim

9    5).)  Under the doctrine of claim differentiation, "different words or phrases used in separate

10   claims are presumed to indicate that the claims have different meanings and scope," and

11   the doctrine "is at its strongest where the limitation sought to be read into an independent

12   claim already appears in a dependent claim."  See Seachange Int'l, Inc. v. C-Cor, Inc., 413

13   F.3d at 1368-69 (internal quotations and citations omitted).  Were the Court to adopt

14   Magma's proposed construction, claim 1 and claim 5 would be identical.

15        Moreover, the specification states that the number of cells in each partition is

16   "approximately the same" and the area of each partition "is proportional to the area of the

17   cells included in it."  (See '114 Patent at 4:45-47.)  As the '114 patent expressly notes that

18   the sizes of cells may be changed, (see id. at 3:21-22), there can be no assumption that all

19   cells are the same size.  Consequently, there is no way to ensure that the area of the

20   partition is "proportional to the area of the cells included in it" without, in fact, measuring the

21   size of the partition by reference to the area of the cells.  Consequently, Synopsys's

22   proposed construction of "partition size" as being measured by either the "number of cells

23   in a partition or the total area of cells in a partition" is supported by the specification and the

24   Court will adopt that construction.

25        With respect to "convergence criterion," the specification states that, in the preferred

26   embodiment, "convergence" is reached once the partitions reach a specified size.  (See id.

27   at 3:54-55.)  Thus, in that example, the "convergence criterion" is the specified size of the

28   partitions.  In the preferred embodiment, the purpose of the "convergence criterion" is to

22

determine when to perform "the detailed placement and route process . . . to complete the physical layout," (see id. at 3:59-61); the specification notes, however, that the invention "can be applied to any one of several phases associated with the physical route and placement of an IC design," (see id. at 3:8-10).  Thus, it is clear that "convergence criterion" is not limited to the specific example discussed in the specification, and no party argues for such a limitation.

The example in the specification suggests, nonetheless, that the convergence criterion is intended to be a condition which, when achieved, triggers the next step in the process.  In the example set forth in the specification, once the steps of (1) "cell separation," (2) "tweak[ing]" the netlist, (3) "changing the spacings," and (4) "partitioning" the cells, are completed, "a determination is made as to whether the current placement has successfully converged," i.e., whether the partitions have reached the desired size.  (See id. at 3:14-55.)  If so, "the detailed placement and route process is performed to complete the physical layout"; if not, the first four steps are repeated until the partitions reach the desired size, i.e., the "convergence criterion."  (See id. at 3:57-61.)

Magma argues that the term "convergence criterion" can only apply to an iterative process, i.e., a process that repeats until a desired result is reached.  Magma's expert, Majid Sarrafzadeh, Ph.D. ("Dr. Sarrafzadeh"), attests that "the phrase 'convergence criteria' . . . necessarily refers to an iterative process" and not to a "direct process that is designed to solve the problem in one pass (i.e., in a known number of steps)."  (See Sarrafzadeh Decl. ¶¶ 21-22.)  Dr. Sarrafzadeh characterizes "optimization methods," such as the process of "arranging transistors in a computer chip so that the resulting layout occupies the smallest area and uses the smallest number of components," as either "direct" or "iterative."  (See id. at ¶¶ 17-18.)  According to Dr. Sarrafzadeh, "direct" methods are those that "produce an answer in a fixed number of computational steps," while "iterative" methods are those that "produce a sequence of approximate answers, designed to converge ever closer to an optimal solution under the proper conditions."  (See id. at ¶ 18.) An "iterative process," Dr. Sarrafzadeh attests, consists of "a sequence of steps that is

23

repeated, or iterated, until some specified result is achieved."  (See id. at ¶ 20.)  Dr.

Sarrafzadeh further attests that the "rate at which an iterative process gets closer to the

desired end result is called the 'convergence rate'."  (See id. ¶ 20.)  Where iterative

processes are used to address complex problems, Dr. Sarrafzadeh attests, there is no

guarantee that the optimal point will be found in an acceptable amount of time;

consequently, a "termination constraint" or "convergence criterion" must be set so that the

process "will terminate when it generates an intermediate result that is close enough to the

optimal point."  (See id.)

       According to Dr. Sarrafzadeh, a "direct process," by contrast, "does not make small

improvements to the answer gradually with the goal of converging on the desired result."

(See id. ¶ 22.)  Rather, Dr. Sarrafzadeh attests, a "direct process is designed to run through

a known set of steps once and produce the result generated at the end of the entire

process" and "[o]nly at the end of execution of the algorithm can the output be realized."

(See id. ¶ 22.)  Thus, in Dr. Sarrafzadeh's opinion, "there can be no concept of establishing

criteria to identify when an intermediate result has come close enough to the desired result

so that the process should be terminated" and "there is no concept of convergence criteria

for a direct or non-iterative process."  (See id. ¶ 23.)  Further, according to Dr. Sarrafzadeh,

"a person of ordinary skill in the art would have used the term 'convergence' only to refer to

an iterative method, and the term 'convergence criteria' to refer to conditions for terminating

an iterative process."  (See id. ¶ 29.)  Dr. Sarrafzadeh notes that the "Summary of the

Invention" section of the '114 patent expressly states that "[a] number of iterations of cell

separation, synthesis of new netlist, size adjustment (if necessary), spacing, and

partitioning are performed until the cells converge."  (See '114 Patent at 2:25-28.)  The

specification, Dr. Sarrafzadeh notes, also describes the act of partitioning as an iterative

process:

> The cells are partitioned first into two groups, then into four, then into eight,
> and so on, until there are only a few cells in each group. . . . If each of these
> partitions . . . is small enough to meet a particular criteria set by the user,
> convergence is declared.

1  (See id. at 4:41-43, 4:52-53.)  Dr. Sarrafzadeh thus concludes that the "convergence

2  criteria" must be defined as referring to "conditions for terminating an iterative process."

3  (See Sarrafzadeh Decl. ¶ 29.)

4      Synopsys's expert, Dr. Harris, recognizes that the inventors of the '114 patent

5  explained to the PTO that the significance of their invention was that "the overall number of

6  iterations required for the design of integrated circuits is minimized."  (See Harris Decl.

7  ¶ 125 and Ex. Y at 6.)  Dr. Harris argues, however, that there is no requirement in the '114

8  patent that the iterative process described in the '114 patent be performed more than once

9  because, ideally, if the convergence criterion is met after the first iteration, there is no need

10  to repeat the process.  (See id. ¶¶ 126-128.)  Although the Court agrees that there is no

11  requirement that the process actually repeat before the convergence criterion is met, the

12  process itself is still iterative in that it is designed to repeat until the convergence criterion is

13  met.  (See, e.g., '114 Patent at 3:57-58 ("If convergence has not been reached, steps 103-

14  106 are repeated.")).

15      For the reasons set forth above, the Court will adopt Synopsys's proposed

16  construction of "partition size" and Magma's proposed construction of "convergence

17  criterion."  Accordingly, the Court will construe "convergence criterion based upon a

18  partition size" as "condition for terminating an iterative process based on the number of

19  cells contained in a partition or the total area of cells in a partition."  For clarity, the Court

20  will define "iterative process" as "a sequence of steps that is intended to be repeated until

21  some specified result is achieved."  (See Harris Decl. ¶ 104; Sarrafzadeh Decl. ¶ 20.)

22          **2.  Cell separation process**

| Disputed Claim Language | Synopsys's Proposed Construction | Magma's Proposed Construction |
|---|---|---|
| Cell separation process | a process which assigns a cell a location or an approximate location on the physical placement area | method of assigning locations to cells such that they do not overlap |

27      The phrase "cell separation process" appears in claims 1, 6, and 11 of the '114

28  patent, each time as part of the longer phrase "executing a cell separation process

25

1    according to the netlist."  (See '114 Patent at 6:56-7:3, 7:13-28, 8:5-22.)  The parties agree

2    that the "cell separation process" involves assigning a location to the cells, but dispute

3    whether the cells are assigned to specific, as opposed to approximate, locations, and

4    whether cells may overlap in any way.

5           In the initial portions of the '114 patent specification, one possible reading of the

6    language is that the "cell separation process" assigns specific locations to cells but does

7    not require that the cells be spaced apart from each other.  For example, the "Summary of

8    the Invention" section of the '114 patent states:

9              [A] cell separation process assigns (x,y) locations to each of the cells. The
               cell location information is supplied to the synthesis tool, which can then
10             make changes to the netlist thereto. In the present invention, the size of the
               placement area is allowed to be scaled according to the new netlist. Next, the
11             cells of the netlist are spaced apart according to a spacing algorithm.

12    (See '114 Patent at 2:16-23.)  Additionally, in the "Detailed Description" portion of the

13    specification, which describes a preferred embodiment of the invention, the inventors

14    reiterate that "cell separation" and "spacing" are separate steps of the patented process.

15    (See id. at 3:14-20, 3:41-47.)  According to the specification, "[t]he cell separation process

16    takes each cell in the netlist and assigns a pair of (x,y) coordinates" which are "used to

17    specify the location of each cell relative to a two-dimensional boundary area in which the

18    circuit is to be placed."  (See id. at 3:16-20.)  The placement of cells during the "cell

19    separation process" is "a best estimate guess," after which "the netlist is tweaked to

20    optimize the design."  (See id. at 3:27-32.)  Only thereafter does the "spacing" of the cells

21    occur, followed by a separate step of partitioning the cells "in order to better 'spread' them

22    apart."  (See id. at 3:41-48.)  The above-cited language arguably suggests that the "cell

23    separation process" includes the step of assigning a location to each cell, but does not

24    include the step of ensuring that the cells are "spaced apart."[13]

25           Elsewhere in the specification, however, in a more detailed description of "cell

26    separation" found in a description of a preferred embodiment, the specification expressly

27    _____

28         [13] Alternatively, this language can be read as requiring separation, i.e., non-overlap,
      followed by improved spacing "according to an algorithm," or formula.

states that "[c]ells <u>must</u> be assigned locations so that they do not overlap each other, they all fit within some overall bounding figure, and the total wiring cost is minimized."  (See <u>id</u>. at 5:23-25 (emphasis added).)  The cell separation process determines "an assigned (x,y) position . . . denoting the approximate centerpoint of the cell."  (See <u>id</u>. at 5:27-28.)  The specification further explains that, in the spacing step, the partition walls are changed "in order to <u>improve</u> the spacings between the cells."  (See <u>id</u>. at 5:32-35 (emphasis added).)  Although the above-cited language appears in the description of a preferred embodiment, (see <u>id</u>. at 4:59-61), the provision that, during cell separation, "[c]ells must be assigned locations so that they do not overlap each other," read in context, describes a requirement of the invention rather than an optional aspect of the preferred embodiment.

Nonetheless, Dr. Harris attests, "[t]o one with ordinary skill in the art, it would make no sense to require that the cells are completely non-overlapping" at the conclusion of the cell separation process.  (See Harris Decl. ¶ 134.)  He further attests that while "it is true that the precise x,y locations for the centerpoints of two cells need to be different (because one cannot have two cells that have precisely the same centerpoint), this does not mean that the entire area of the cells must or should be non-overlapping."  (See <u>id</u>.)  According to Dr. Harris, "it is typical during rough placement, that cells are assigned overlapping locations, and this overlap is usually dealt with during detailed placement."  (See <u>id</u>. ¶ 138.)

Even if it is "typical" for cells to overlap during rough placement, the specification of the '114 patent expressly states, as noted, that "[c]ells must be assigned locations so that they do not overlap each other."  (See '114 Patent at 5:23-25.)  The Federal Circuit has held that "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor" and, in such instances, "the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive."  See <u>Phillips v. AWH Corp.</u>, 2005 WL 1620331 at *8.  Accordingly, the Court concludes that the "cell separation process" must result in assignment of cells to locations such that they do not overlap each other in any way.

With respect to whether the cells are assigned to precise locations during the "cell

separation process," the specification repeatedly states that the cells are assigned "(x,y)" locations during the cell separation process.  (See, e.g., '114 Patent, Abstract and 2:17-18, 3:16-17, 5:12-14, 5:25-28.)  Synopsys's argument that the locations nonetheless may be approximate is based entirely on one sentence in the specification:  "The output from cell separation process 306 is a number of cells, each of which has an assigned (x,y) position 307 denoting the approximate centerpoint of the cell."  (See id. 5:25-28.)  As Dr. Sarrafzadeh suggests, however, where a cell has an irregular shape, its precise centerpoint may be difficult to determine, and the cell nonetheless is assigned to a precise (x,y) location, which location is intended to represent the "approximate centerpoint" of the cell.  (See Sarrafzadeh Decl. ¶ 43; see also '114 Patent at 5:25-28.)  Synopsys fails to explain how a cell can be assigned to specific (x,y) coordinates and still be assigned only an "approximate" location.

Accordingly, the Court will adopt Magma's construction of "cell separation process" and construe the term as "a method of assigning locations to cells such that they do not overlap."

### 3.  Partitioning the cells into a plurality of partitions

| Disputed Claim Language | Synopsys's Proposed Construction | Magma's Proposed Construction |
|---|---|---|
| Partitioning the cells into a plurality of partitions | subdividing or distributing the cells into more than one partition | subdividing cells in one region into multiple groups of cells |

The phrase "partitioning the cells into a plurality of partitions" appears in claims 1, 6, and 11 of the '114 patent.  The parties' dispute as to the construction of this term relates to whether "partitioning" is limited to subdividing a group of cells from a single region, or whether it also encompasses distributing cells to different partitions without moving the partition boundaries.  In other words, if one analogizes a group of cells to a cherry pie, the dispute is whether the pie is "partitioned" only by cutting it into slices, or whether it also may be "partitioned" by moving individual cherries from one location in the pie to a different location in the pie.

1    The "Summary of the Invention" section of the '114 patent sets forth no requirement

2  that the cells be partitioned in any particular manner, providing only that "[a] partitioning

3  algorithm is then applied to group the cells into a plurality of partitions."  (See '114 Patent at

4  2:23-25.)  The specification of the '114 patent, however, expressly defines "partitioning" as

5  "the process of subdividing the cells in order to better 'spread' them apart."  (See id. at

6  3:48-49.)  The specification nevertheless does go on to note that "[t]here are a number of

7  different petitioning approaches that can be implemented with the present invention," citing

8  two articles by name.  (See id. at 5:38-56.)  The patent also provides that "[o]ther

9  approaches to the partitioning process include min-cut, force-directed, simulated annealing,

10  and spectral approaches."  (See id. at 5:56-58.)

11    Magma argues that "partitioning," in the context of the '114 patent, requires

12  "subdividing" the cells, i.e., dividing a group of cells into smaller parts, rather than

13  distributing cells to different locations.  As Magma notes, in a description of the preferred

14  embodiment, "partitioning" is conducted as follows:  "A cell (e.g., in the shape of a

15  rectangle) is broken into two roughly equal sizes by drawing either a horizontal or vertical

16  line through the approximate midpoint."[14]  (See id. at 3:49-52.)  In the preferred

17  embodiment,

18    [t]he first step of partitioning divides the n cells into two sets of n/2 cells. The
      number of cells in each side is approximately the same. The area of each half
19    is proportional to the area of the cells included in it. The next step of
      partitioning is to divide each of these groups in two, this time on the other
20    axis. This process continues until there are only a few cells in each group
      (e.g., twenty or less).
21

22  (See id. at 4:43-50.)  The above-cited language essentially describes partitioning

23  contiguous groups of cells in the same manner as one might cut a pie into slices.

24    Synopsys argues that Magma's construction ignores an embodiment described in

25  the '114 Patent in which, according to Dr. Harris, "it is not necessary to draw additional

26  horizontal and vertical lines for subdividing the cells."  (See Harris Decl. ¶ 143 (citing '114

27  _____

28    [14] It appears, based on the context of this statement, that partitioning applies to a
      group of cells, rather than to a single cell.

Patent at 4:28-36).)  The '114 patent recognizes that during the various iterations of the

rough placement process, additional cells might be added to the netlist,  (see id. at 3:20-

26), and that despite "efficient partitioning," "there might come a point where there is not

enough room to add an additional cell." (See id. at 4:21-24.)  According to the

specification: "The present invention overcomes this limitation whereby, the total area is

allowed to expand in order to accommodate additional nets and/or cells." (See id. at 4:24-

26.)  The embodiment cited by Dr. Harris is described in Figure 2 of the '114 Patent:

> An example of an expanded area is shown as 213. Expanding the total area affects the partitioning. For example, the location of vertical cutline 214 corresponding to the original area size is now moved to location 215 in order to account for the increase in size as the width of the original boundary 216 is increased by shifting the right boundary to location 217. A change in the partitioning might lead to different placements. For example, prior to enlarging the area, cell 218 belonged to the rightmost partition. After the enlargement, cell 218 now belongs to the leftmost partition.

(See id. at 4:26-36 and Fig. 2.)  Dr. Harris attests that "[t]his is a technique of subdividing

the cells, where, as a result of shifting the partition boundary, the cells in two different

regions are redistributed among each other to form two new partitions," and said technique

"does not involve the drawing [of] either horizontal or vertical lines in one region." (See

Harris Decl. ¶ 143.)

The process described by Dr. Harris, however, is not part of the partitioning process

itself, but rather, as Magma argues, a process that occurs during the step of "spacing" the

cells in response to changes in the netlist.[15]  (See '114 Patent at 3:20-47, 5:33-35; see also

Dr. Sarrafzadeh. Decl. ¶ 54.)  Further, in such process, although cells may be reassigned

from one partition to another, such reassignment again is accomplished by moving partition

boundaries, not by moving the cells themselves.[16]  In sum, the process cited by Dr. Harris

---

[15] The Court notes that each of the claims that contains the step of "partitioning the cells into a plurality of partitions" also includes the step of "modifying the spacings of the cells responsive to changes made to the netlist." (See '114 Patent at 6:66-67, 7:24-25, 8:18-19.)

[16] By expanding the area in order to modify the space between cells, preexisting partition boundaries necessarily move to ensure that the partitions remain of equal size. (See id. at 4:22-36, 4:45-47.)

1    not only does not result in "distributing" cells from one area to another, it is not part of

2    partitioning at all.

3    Moreover, although the specification expressly notes that "[t]here are a number of

4    different partitioning approaches that can be implemented with the present invention," and

5    although the patent expressly identifies a number of different approaches, (see id. at 5:38-

6    40), Synopsys presents no evidence that any of these methods involves distributing rather

7    than subdividing groups of cells.  Magma, by contrast, presents evidence that one of the

8    articles cited in the '114 patent, "A Procedure for Placement of Standard-Cell VLSI

9    Circuits," (see '114 Patent at 5:49-50), discusses partitioning cells by "divid[ing]" cells,

10   rather than distributing them.[17]  (See Sarrafzadeh Decl. ¶ 50 and Ex. 33.)  Dr. Sarrafzadeh

11   also cites his own textbook, "An Introduction to VLSI Physical Design," in which he states

12   that "[p]artitioning is the task of dividing a circuit into smaller part," and includes a diagram

13   that depicts a group of cells being subdivided.  (See id. ¶ 51 and Ex. 34.)  Dr. Sarrafzadeh

14   further attests that it would be "completely unusual" to use the term "partitioning" to

15   describe "merely moving cells around between two partition[s]," and that "the specification

16   of the '114 Patent is consistent with the ordinary use of the term partitioning to mean

17   subdividing."  (See id. ¶ 53.)

18   In his reply declaration, Dr. Harris points to two articles which, he contends, show

19   that "one may 'partition' by redistributing cells between existing regions."  (See Harris Reply

20   Decl. ¶ 61 and Exs. C and D.)  Neither article is cited in the '114 Patent, however, and Dr.

21   Harris has not opined that any of the methods of partitioning that are cited in the '114

22   Patent involve redistributing cells, rather than subdividing groups of cells.

23   Accordingly, as the patent specifically defines "partitioning" as "the process of

24   subdividing the cells in order to better 'spread' them apart," (see '114 Patent at 3:48-49),

25   and as there is no evidence that any of the particular methods of partitioning cited in the

26   patent involve distributing cells, rather than subdividing groups of cells, the Court will adopt

27   _____

28   [17] Dr. Sarrafzadeh does not discuss the other methods of partitioning set forth in the '114 patent.

31

1   Magma's construction and construe the phrase "partitioning the cells into a plurality of

2   partitions" as "subdividing cells in one region into multiple groups of cells."

3                                                    **CONCLUSION**

4          For the reasons set forth above, and for good cause shown, the Court construes the

5   disputed terms of the patents as follows:

6          **'446 and '438 Patents**

| Disputed Claim Language | Court's Construction |
| --- | --- |
| Initial intended delay | a delay set as a target |
| Realized | the delay obtained is less than or approximately equal to the initial intended delay |
| Assigned in buckets | assigned to areas in which items are stored or contained, such as partitions or sectors of a placement area |
| Relative delay value | a delay set as a target |

          **'114 Patent**

| Convergence criterion based upon a partition size | condition for terminating an iterative process based on the number of cells contained in a partition or the total area of cells in a partition; an "iterative process" is a sequence of steps that is intended to be repeated until some specified result is achieved. |
| --- | --- |
| Partition size | the number of cells in a partition or the total area of cells in a partition |
| Cell separation process | a method of assigning locations to cells such that they do not overlap |
| Partitioning the cells into a plurality of partitions | subdividing or distributing the cells into more than one partition |

          **IT IS SO ORDERED.**

Dated: August 23,  2005                              _____
                                                     MAXINE M. CHESNEY
                                                     United States District Judge